**Thomas P. Smith, Jr.**
**Celeste A. Chase**
**Paul G. Gizzi**
**Samuel M. Kalar**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street**
**Suite 20-100**
**New York, NY 10004-2616**
**(212) 336-0077 (Gizzi)**
**gizzip@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**-against-**<br><br>**JESSE R. MITCHELL,**<br><br>**Defendant.** | **<u>COMPLAINT</u>**<br><br>**26 Civ. ____ (     )**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant, Jesse R. Mitchell ("Mitchell" or "Defendant"), alleges as follows:

## SUMMARY

1. This action concerns illegal insider trading by Mitchell in the securities of public company The Trade Desk, Inc. ("TTD").

2. From June 2024 to April 2026, Mitchell was TTD's Senior Director of Financial Planning and Analysis. Through his role, Mitchell received material nonpublic information (referred to herein as "MNPI") concerning TTD's preliminary quarterly earnings results in advance of their public release.

3. On two occasions, starting shortly after joining TTD, Mitchell took advantage of his advanced knowledge of MNPI to engage in illegal insider trading in TTD securities, which violated the federal securities laws.

4. Mitchell's trading also violated TTD's internal policies, which prohibited both: (i) trading during specified blackout periods around corporate earnings announcements; and (ii) trading in TTD options.

5. Mitchell used his advanced knowledge of MNPI concerning TTD's quarterly earnings to profit in two different ways. First, Mitchell illegally profited from a *positive* earnings announcement by purchasing TTD common stock to bet that TTD's share price would increase. Second, Mitchell illegally profited from a *negative* earnings announcement by trading options to bet that TTD's share price would decrease.

6. In the first instance of insider trading, on or around July 17, 2024, Mitchell received TTD's preliminary earnings for the second quarter of 2024 (referred to herein as "Q2 2024") before the results were publicly announced. The preliminary Q2 2024 results indicated that TTD would beat analysts' earnings estimates for the quarter.

7. From July 24 through August 7, 2024, Mitchell purchased a total of 3,850 shares of TTD common stock.

8. After market close on August 8, 2024, TTD publicly announced positive Q2 2024 earnings results. By market close the following day, August 9, 2024, TTD's share price had increased over 12%.

9. By the end of the day on August 9, 2024, Mitchell had sold all 3,850 TTD shares, thereby obtaining ill-gotten profits of nearly $20,000.

10. In the second instance of insider trading, on or around January 20, 2025, Mitchell received TTD's preliminary earnings for the fourth quarter of 2024 (referred to herein as "Q4 2024") before the results were publicly announced. The preliminary Q4 2024 results indicated that TTD—for the first time in its eight-year history—would miss its previous revenue guidance to analysts.

11. From February 7 through February 12, 2025, Mitchell purchased 200 out-of-the-money TTD put options, paying approximately $15,000.

12. After market close on February 12, 2025, TTD publicly announced negative Q4 2024 revenue results, reflecting the revenue guidance miss. By market open the next morning, February 13, 2025, TTD's share price had dropped by over 30%.

13. Mitchell sold all 200 TTD put options on February 13, 2025, thereby obtaining ill-gotten profits of over $318,000.

14. In total, from these two instances of illegal insider trading, Mitchell obtained ill-gotten profits of over $338,000.

## VIOLATIONS

15. By virtue of the foregoing conduct and as alleged further herein, Mitchell has violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

16. Unless Mitchell is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

17. The Commission brings this action pursuant to the authority conferred upon it by

Exchange Act Sections 21(d) and 21A [15 U.S.C. §§ 78u(d) and 78u-1(a)].

18. The Commission seeks a final judgment: (a) permanently enjoining Mitchell from violating the federal securities laws and rules this Complaint alleges he violated by committing or engaging in specified actions or activities relevant to such violations; (b) ordering Mitchell to disgorge all ill-gotten gains he received as a result of the violations alleged herein, and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)]; (c) ordering Mitchell to pay civil penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1]; (d) permanently prohibiting Mitchell from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78*l*] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

19. This Court has jurisdiction over this action pursuant to Exchange Act Sections 21, 21A, and 27 [15 U.S.C. §§ 78u, 78u-1, and 78aa] and 28 U.S.C. § 1331.

20. Mitchell, directly or indirectly, has made use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged herein.

21. Venue lies in this District under Exchange Act Section 27 [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including: (i) Mitchell was physically present in this District during some of the illegal trading activity alleged herein; and (ii) TTD's common stock trades on the NASDAQ Stock Market, which is headquartered in this District.

## DEFENDANT

22. **Mitchell**, age 48, is a resident of Ventura, California. Mitchell served as TTD's Senior Director of Financial Planning and Analysis from June 3, 2024, until April 27, 2026, when he was terminated. Mitchell became licensed in Pennsylvania as a CPA in December 2003. His license expired in December 2021 and has not been renewed.

## RELEVANT ENTITY

23. **TTD** is a digital advertising company incorporated in Nevada and headquartered in Ventura, California. It has a class of common stock registered under Exchange Act Section 12(b) [15 U.S.C. § 78*l*(b)] that is publicly traded on the NASDAQ Stock Market under the symbol TTD.

## RELEVANT TRADING TERMS

24. A "put option" is a contract that gives its holder the right, but not the obligation, to sell the underlying asset at a specified "strike price" within a specified period that ends on an "expiration date."

25. A put option is "out of the money" if the strike price is below the asset's current market price. Such an option has economic value only if the market price drops below the strike price.

## FACTS

### I. Mitchell's Employment with TTD

26. As a member of TTD's Financial Planning and Analysis team, Mitchell was responsible for cost and revenue modeling, forecasting, and other strategic financial initiatives.

27. In his position at TTD, Mitchell received TTD's preliminary and final quarterly earnings and other financial results in advance of their public release.

## II. TTD'S Insider Trading Policy

28. At all relevant times, TTD had in place an insider trading policy applicable to all employees (the "TTD Policy").

29. On June 3, 2024—the same day he began working at TTD, and only three weeks before his first instance of insider trading—Mitchell electronically certified that he had completed training on the TTD Policy.

30. The TTD Policy provided, among other things, an overview of insider trading laws and the prohibition on trading securities while in possession of MNPI, which it defined as including "information about … corporate earnings or earnings forecasts."

31. The TTD Policy also stated that trading in TTD securities by employees was prohibited during specified blackout periods, which began on the 14th day before the end of each fiscal quarter and ended after the first full trading day following the public release of earnings data.

32. In advance of these blackout periods, TTD's Chief Legal Officer emailed all TTD employees a reminder of the exact dates of the blackout period. These emails referenced and attached the TTD Policy.

33. The TTD Policy also included an explicit—and permanent—ban on all trading in TTD options by TTD employees:

> A transaction in options is, in effect, a bet on the short-term movement of the Company's stock and therefore creates the appearance that an officer, director or employee is trading based on inside information. Transactions in options also may focus an officer's, director's or employee's attention on short-term performance at the expense of the Company's long-term objectives. Accordingly, transactions in puts, calls or other derivative securities involving the Company's equity securities, on an exchange or in any other organized market, are prohibited by this Policy.

## III. Mitchell's Trading on MNPI in Advance of TTD's Q2 2024 Earnings Release

34. TTD's trading blackout period associated with its Q2 2024 earnings announcement lasted from market close on June 14, 2024, to market open on August 12, 2024.

35. On June 11, 2024, all TTD employees received an internal company-wide email reminder referencing and attaching the TTD Policy and stating the dates of the Q2 2024 blackout period.

36. On July 17, 2024, Mitchell received an email that attached materials detailing, among other things, TTD's preliminary quarterly financial results for Q2 2024, which constituted MNPI.

37. TTD's preliminary Q2 2024 results showed quarterly revenue of $585 million, beating analysts' estimates of approximately $578 million.

38. From July 24, 2024, to August 7, 2024—in two of his personal brokerage accounts ("Brokerage Account 1" and "Brokerage Account 2")—Mitchell purchased 3,850 shares of TTD common stock for a total of $346,538.29, at an average price of approximately $90.01 per share.

39. After market close on August 8, 2024, TTD publicly announced its Q2 2024 revenue of $585 million.

40. From market close on August 8, 2024, to market close on August 9, 2024, TTD's share price increased by over 12%.

41. By the end of the day on August 9, 2024, Mitchell had sold all 3,850 TTD shares held in Brokerage Account 1 and Brokerage Account 2 for a total of $366,234.40, at an average price of approximately $95.13 per share.

42. Mitchell's trading in TTD common stock surrounding TTD's Q2 2024 earnings release occurred after Mitchell obtained MNPI regarding TTD's Q2 2024 earnings and during

TTD's trading blackout period, in violation of TTD's explicit ban on trading during blackout periods.

43. Mitchell's trading in TTD common stock surrounding TTD's Q2 2024 earnings release resulted in illicit profits of $19,696.11.

44. The below chart is a timeline of relevant activity regarding Mitchell's insider trading surrounding TTD's Q2 2024 earnings release:

| Date | TTD Common Stock Transaction | Brokerage Account | Average Share Price (Rounded) | Total Price |
|---|---|---|---|---|
| June 14, 2024 | TTD trading blackout period begins | | | |
| July 17, 2024 | Mitchell receives MNPI (TTD's preliminary Q2 2024 financial results) | | | |
| July 24, 2024 | 100 shares purchased | 1 | $93.46 | $9,345.91 |
| July 24, 2024 | 635 shares purchased | 1 | $89.81 | $57,029.48 |
| July 24, 2024 | 750 shares purchased | 1 | $95.72 | $71,787.90 |
| July 24, 2024 | 750 shares purchased | 1 | $97.20 | $72,900.00 |
| July 30, 2024 | 115 shares purchased | 1 | $87.50 | $10,062.50 |
| August 2, 2024 | 500 shares purchased | 2 | $82.83 | $41,415.00 |
| August 5, 2024 | 500 shares purchased | 1 | $81.49 | $40,745.00 |
| August 7, 2024 | 500 shares purchased | 2 | $86.51 | $43,252.50 |
| August 8, 2024 | TTD Q2 2024 financial results publicly announced at 4:01 pm ET | | | |
| August 8, 2024 (4:06 pm ET) | 176 shares sold | 2 | $95.00 | $16,719.50 |
| August 8, 2024 (4:06 pm ET) | 324 shares sold | 2 | $95.00 | $30,779.09 |
| August 9, 2024 | 500 shares sold | 2 | $95.00 | $47,498.59 |
| August 9, 2024 | 800 shares sold | 1 | $95.35 | $76,277.74 |
| August 9, 2024 | 2,050 shares sold | 1 | $95.10 | $194,959.48 |
| August 12, 2024 | TTD trading blackout period ends | | | |
| **Net Profit: $19,696.11** | | | | |

45. At the time of his July 24, 2024, purchases of a total of 2,235 shares of TTD common stock, Mitchell was in New York, New York.

## IV. Mitchell's Trading on MNPI in Advance of TTD's Q4 2024 Earnings Release

46. TTD's trading blackout period associated with its Q4 2024 earnings announcement lasted from market close on December 16, 2024, to market open on February 14,

2025.

47. On December 11, 2024, all TTD employees received an internal company-wide email reminder referencing and attaching the TTD Policy and stating the dates of the Q4 2024 blackout period.

48. On January 20, 2025, Mitchell received an email that attached materials detailing, among other things, TTD's preliminary quarterly financial results for Q4 2024, which constituted MNPI.

49. TTD's preliminary Q4 2024 results showed quarterly revenue of approximately $741 million.

50. On November 7, 2024, during its third-quarter 2024 earnings call, TTD publicly announced its estimated Q4 2024 revenue of at least $756 million.

51. Q4 2024 was the first time in TTD's eight-year history that it failed to meet its own quarterly revenue guidance.

52. From February 7 to February 12, 2025, Mitchell purchased a total of 200 TTD put options in Brokerage Account 1 for $15,618.35 (the "Put Options").

53. Each of the Put Options had an expiration date of February 14, 2025, and was out of the money by at least $17.36 based on the closing prices of TTD common stock on the dates purchased.

54. After market close on February 12, 2025, TTD publicly announced its Q4 2024 revenue of $741 million, reflecting the company's revenue guidance miss.

55. By market open on February 13, 2035, TTD's share price had dropped by over 30%.

56. By the end of the day on February 13, 2025, Mitchell had sold all 200 of the Put

Options for a total of $333,980.80.

57. Mitchell's trading of the Put Options surrounding TTD's Q4 2024 earnings release occurred after Mitchell obtained MNPI regarding TTD's Q4 2024 earnings and during TTD's trading blackout period, in violation of TTD's explicit ban on trading during blackout periods and in violation of TTD's explicit and permanent ban on options trading.

58. Mitchell's trading of the Put Options resulted in illicit profits of $318,362.45.

59. The below chart is a timeline of relevant activity regarding Mitchell's insider trading surrounding TTD's Q4 2024 earnings release:

| **Date** | **TTD Put Option Transaction** | **Brokerage Account** | **Price** |
|---:|---:|---:|---:|
| December 16, 2024 | TTD trading blackout period begins | | |
| January 20, 2025 | Mitchell receives MNPI (TTD's preliminary Q4 2024 financial results) | | |
| February 7, 2025 | 33 contracts purchased | 1 | $4,621.54 |
| February 10, 2025 | 67 contracts purchased | 1 | $4,492.13 |
| February 12, 2025 (12:39 pm ET) | 100 contracts purchased | 1 | $6,504.68 |
| February 12, 2025 | TTD Q4 2024 financial results publicly announced at 4:01 pm ET | | |
| February 13, 2025 | 200 contracts sold | 1 | $333,980.80 |
| February 14, 2025 | TTD trading blackout period ends | | |
| **Net Profit: $318,362.45** | | | |

## V. Mitchell Violated the Federal Securities Laws

60. TTD's preliminary quarterly financial results, which Mitchell obtained in advance of their public release through his employment at TTD, were material and nonpublic. A reasonable investor would have viewed this information as important to his or her investment decision and as significantly altering the total mix of information available to the public regarding TTD's securities.

61. By virtue of his employment with TTD, Mitchell owed a duty of trust and confidence to TTD that included a duty to not use TTD's MNPI to trade TTD securities for his

personal benefit.

62. Mitchell traded in TTD securities while aware of and on the basis of MNPI concerning TTD in breach of his duty of trust and confidence to TTD.

**CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

63. The Commission re-alleges and incorporates by reference the allegations in paragraphs 1 through 62.

64. Defendant, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has: (i) employed one or more devices, schemes, or artifices to defraud; (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

65. By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Action Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Defendant and his agents, servants, employees, and attorneys, and all persons in active concert or participation with any of them from violating, directly or

indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Ordering Defendant to disgorge all ill-gotten gains he received, directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

**III.**

Ordering Defendant to pay civil penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1];

**IV.**

Permanently prohibiting Defendant from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78*l*] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)] pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

**V.**

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated: New York, New York
August 20, 2026

*/s/ Paul G. Gizzi*

Thomas P. Smith, Jr.
Celeste A. Chase
Paul G. Gizzi
Samuel M. Kalar
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
(212) 336-0077 (Gizzi)
gizzip@sec.gov